**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANIELLE K. MILLER. | ) | |
| | ) | Civil Case No.: 1:25-cv-11384 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HURON CONSULTING SERVICES LLC, | ) | |
| a Delaware limited liability company; and | ) | |
| HURON CONSULTING GROUP, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | JURY TRIAL DEMAND |
| | ) | |
| Defendants. | ) | |

**VERIFIED FIRST AMENDED COMPLAINT**

Plaintiff Danielle K. Miller (hereinafter "Plaintiff" or "Ms. Miller"), by and through her undersigned counsel, Abigail Schmitz of Abigail Schmitz Law, LLC, hereby files this First Amended Complaint ("FAC") against Defendants Huron Consulting Services LLC ("HCS") and Defendants Huron Consulting Group, Inc. ("HCG", combined with "HCS", hereinafter "Defendants" or "Huron").

**NATURE OF ACTION**

1.      This action asserts discrimination and unlawful employment practices on the basis of race (African American), including disparate treatment, failure to hire/promote, failure to train, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, *42* U.S.C. §2000e, et seq.; 42 U.S.C. § 1981; and the Illinois Human Rights Act, *775 ILCS 5/2, et seq.*

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, as it asserts claims that arise under laws of the United States, specifically Title VII, as amended, 42 U.S.C. §2000e, et seq., and 42 U.S.C. § 1981.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367

4.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b) based on the fact that a substantial part of the actions complained of occurred within the Northern District of Illinois, and Defendants are both registered as foreign entities in Illinois and are doing business within this judicial district.

## EXHAUSTION OF REMEDIES

5.      Plaintiff has exhausted all of her administrative remedies.

6.      On or about May 29, 2024, Plaintiff filed a Form 5 Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), recorded as Agency No. 440-2024-02094, in which she alleged that she was subjected to unequal terms and conditions of employment, failure to hire/promote, a hostile work environment, disparate treatment, and discrimination on the basis of race and sex in violation of Title VII, 42 U.S.C. § 1981, and Illinois human rights anti-discrimination and harassment laws.

7.      The claims were investigated by the EEOC. Huron submitted a position statement and Plaintiff submitted a rebuttal.

8.      Plaintiff received her Right to Sue (RTS) letter from the EEOC on April 2, 2025.

**Exhibit A: Notice of Right to Sue**.

9. On or about June 25, 2025, Plaintiff filed her Complaint in the Circuit Court of Cook County, Illinois, Case No. 2025-L-0008115. Plaintiff's Complaint was timely filed within 90 days of the April 2, 2025 issuance of the right to sue notice.

10. On or about September 19, 2025, Plaintiff's complaint was removed to federal court, Case No. 1:25-cv-11384. (**Dkt. 1**).

## PARTIES

11. Plaintiff Miller is a resident of Illinois and a United States Citizen.

12. Plaintiff's primary residence is located at 6301 N. Sheridan Road, #10G, Chicago, Illinois 60660.

13. Defendant Huron Consulting Group Inc. ("HCG") is a publicly traded Delaware corporation with its principal place of business at 550 West Van Buren Street, Chicago, Illinois, 60607. HCG is traded on the NASDAQ stock exchange under the ticker symbol "HURN."

14. Defendant HSC is a U.S. limited liability company registered in the state of Delaware (file number 3521607) with a foreign registration in the State of Illinois (file number 00782629).

15. Huron's principal place of business is headquartered in Chicago, Illinois, Cook County, at 550 West Van Buren Street, Chicago, Illinois, 60607.

16. At all times relevant to this Complaint, Defendants HCG and HCS are affiliates under a common holding company structure and operated as joint employers, a single integrated enterprise, and/or alter egos of one another with respect to Plaintiff's employment.

17. HCG and HCS shared common ownership through their holding company structure, common management, centralized control of labor relations, and interrelated operations. HCG, as the publicly traded entity and public face of the organization, exercised

significant control over employment decisions made by HCS and other affiliates, including hiring, termination, promotion, compensation, work assignments, and other terms and conditions of employment.

18. HCG and HCS held themselves out to Plaintiff, clients, investors, and the public as a single integrated entity operating under the unified brand "Huron."

19. At all times relevant, Plaintiff reasonably believed she was employed by HCG based on how Defendants held themselves out through HCG's website (on which Plaintiff's biography appeared), unified business operations under the "Huron" brand, and integrated corporate identity. Plaintiff had no reason to know that HCS, rather than the publicly traded HCG, would be listed on her W-2, as Defendants presented themselves as a single unified organization.

20. Defendants failed to maintain arm's-length relationships and failed to observe corporate formalities between the two entities with respect to employment matters. The complex corporate structure, in which both HCG and HCS operate as affiliates under a common holding company, further obscured the distinction between the entities from Plaintiff's perspective.

21. Each Defendant employed more than fifteen (15) employees during all relevant times and is therefore subject to Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. §2000e, et seq.*, *42 U.S.C. § 1981*, and the Illinois Human Rights Act, *775 ILCS 5/1-101, et seq.*

22. Based on the foregoing, Defendants Huron are subject to lawsuit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of their employees or agents and is therefore liable pursuant to the doctrine of *Respondeat Superior*.

## FACTUAL BACKGROUND

23.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

24.     At all times relevant, Plaintiff Miller is a 50-year-old, African-American female.

25.     Miller is a highly educated, seasoned healthcare professional with extensive sales and health equity experience, holding a Bachelor of Science in Nursing, a Master of Science in Nursing Education, and a Doctorate of Nursing Practice with her dissertation focusing on Social Determinants of Health and Impact on Health Equity and Patient Care Outcomes.

26.     Miller began her employment with Huron as a Senior Director on or about October 25, 2021.

27.     Huron terminated Miller's employment on or about December 1, 2023.

28.     Throughout Miller's employment with Huron, despite a lack of training and mentorship promised to her, Miller received "meets expectations" performance reviews, salary increases, and bonuses. Further, on October 31, 2022, Miller was awarded the Huron Spot Award for her contributions to Huron and acknowledging her value on the New York City Health and Hospitals HERRC project.

### *Pre-Employment Race Discrimination/Failure to Hire-Promote*

29.     On or about May 2021, Miller was initially contacted by Gabriel Anthony (Caucasian male), Huron's Director of Recruiting, recruiting senior leadership for the Huron healthcare team.

30.     On or about July 29, 2021, Mr. Anthony reached out to Miller again to recruit her for a Managing Director or Principal position with the Huron leadership team and eventually scheduled an interview for August 4, 2021.

5

31.     During the interview, Mr. Anthony told Miller that she lacked the required sales experience for the Managing Director or Principal position and was more suited for the Senior Director position, despite Miller having over seven (7) years of extensive sales experience in higher-level positions at other companies, including Grant Thornton, Infor Healthcare, and Amazon Web Services (AWS).

32.     Miller subsequently interviewed with a series of other Huron executives including Managing Director Larry Stuckey (Caucasian male); Senior Director Martin Bloomenkrantz (Caucasian male); Plaintiff's would-be manager Matthew Berkley (African American male); Managing Director Nicole Bengston (Caucasian female); and Senior Director Keilana Frank (African American female).

33.     On or about September 30, 2021, Mr. Anthony sent Miller an offer letter for the Senior Director position instead of the Managing Director or Principal position for which she was recruited.

34.     Before accepting the Senior Director position, Miller expressed concerns that she was clearly qualified for the Managing Director or Principal position and wanted to ensure that accepting the lower-level Senior Director position would set her up for success and promotion within the Huron organization.

35.     Mr. Anthony assured Miller that if she accepted the Senior Director position, she would be partnered with a managing director to guide her and set her up for promotion, and she would be assigned to a mentor program. Mr. Anthony also assured her that he would work to secure a mentor for her to ensure her success and ultimate promotion.

36.     Ms. Frank also informed Plaintiff that Huron had a program to partner senior directors with managing directors to ensure they are on track for promotion.

37.     On or about October 1, 2021, Miller signed and accepted the Senior Director position, despite expectations of being hired for the Managing Director role, with a base salary of $235,000 annually, a $10,000 signing bonus, a pro-rated annual Incentive Compensation Program discretionary bonus (beginning January 1, 2022), and with the expectation of being assigned a mentor.

38.     Miller started her Senior Director position on or about October 25, 2021.

39.     Miller's Senior Director position responsibilities included, but were not limited to, leading and delivering client engagements and implementing solutions that addressed healthcare organizations' most challenging business needs; ensuring successful client outcomes by fostering effective work environments; proactively resolving issues; managing the full scope of engagement economics including budgets, forecasts, revenue targets, margins, and billing; managing business development and client relationships; cultivating relationships with current and prospective clients; and developing sales presentations and shaping strategic delivery models.

40.     Miller later learned that Eileen Gillespie (Caucasian female) was hired as a Principal in May 2022, allegedly because of her subject matter expertise and extensive sales experience. However, Miller had comparable or superior qualifications. While Ms. Gillespie is approximately 10 years older than Miller and worked for 3.5 years with Ernst & Young, Miller held a higher role at Grant Thornton and had greater sales experience with Grant Thornton, Infor Healthcare, and Amazon Web Services (AWS). Miller had subject matter expertise in health equity but was never considered for the Principal position.

*Race Discrimination After Hire - Failure to Provide Promised Training and Mentorship*

41.     Upon hire in October 2021, Miller was informed by Nicole Bengston, Managing Director (Caucasian female), that for her first project she would receive on-the-job training and would shadow another Senior Director for project implementation work.

42.     Miller was assigned Martin Bloomenkrantz (Caucasian male) as her peer coach.

43.     While Bloomenkrantz was assigned to mentor Miller, and Miller was assigned several introductory meetings with other Huron Senior Directors and Managing Directors, these meetings were brief, and Bloomenkrantz never meaningfully mentored Miller. Miller and Bloomenkrantz had their first and only scheduled meeting on December 3, 2021, but after that he only made himself available to Miller if she reached out to him for guidance regarding Huron's key business expectations for Senior Directors and providing guidance on Huron methodology.

44.     Despite not receiving any meaningful on-the-job training or mentoring, Miller was assigned to her first project—Christ Community Center—on December 6, 2021. Under the expectation that Miller would be shadowing Senior Director Maureen Hydok (Caucasian female), Hydok only met with Miller for approximately 30 minutes before the client meeting, told Miller she was there to support her, and then instructed Miller to take the lead on the project. No shadowing or mentoring was ever provided.

45.     Throughout 2022, Huron failed to offer Miller any meaningful training, support, or guidance from Hydok, Bloomenkrantz, Michelle Dziewiontkoski (Miller's onboarding specialist), or any other Huron executive.

*Denial of Sales Opportunities Required for Promotion*

46.     In January 2022, Miller initiated a meeting with Huron Managing Director Costa Mega (Caucasian male) regarding Strategic Sales and informed him of her experience supporting

8

sales teams in her former roles. Miller then attended nearly all sales meetings in 2022, but Huron excluded her from almost all potential sales calls and sales opportunities necessary to qualify for promotion.

47.     In January 2022, after Kat Caldwell (Caucasian female), Manager of Healthcare Portfolios and Management, sent out an email about leading various potential health equity and diversity projects with Intermountain Health, Miller replied to Caldwell with excitement, outlining ways to approach the project. Miller's project insights fell on deaf ears and Caldwell never responded to her interest in the sales projects.

48.     In order to be promoted at Huron, Senior Directors must not only be involved in project initiatives, but must also initiate and close sales. Huron systematically denied Miller access to the sales opportunities that were prerequisites for promotion, while providing such opportunities to Caucasian Senior Directors.

***Discriminatory Project Assignments and Removal from Leadership Roles***

49.     In March 2022, Miller was assigned to co-lead the implementation for a Length of Stay Project at Nemours Children's Health with co-lead Senior Director Sam Coopley (Caucasian male). Miller was assigned to this project despite having no pediatric background and having not been trained in the methodology. Coopley was unable to provide Miller with any support, leaving Miller to learn the methodology, implement the methodology, and advise the client without any support or training.

50.     In September 2022, Miller was given the opportunity to join the New York Health and Hospital Systems (NYHHS) alternative care sites project, in which she was excited to serve this vulnerable population. After working 12-hour days and 40-plus hours per week flying back and forth to New York City, Miller was removed as the project lead for clinical vendor

9

relationships in favor of an underqualified, younger, and less experienced non-African American female, Choiwing Young.

51.     Miller was removed as project lead despite being told by Huron Managing Director Beth Callahan (Caucasian female) that she would lead the project with DocGo and Somos, NYHHS's partner vendors on the project. Young had no clinical experience, and DocGo was an all-clinical project.

***Racially Insensitive Comments and Complaints to Leadership***

52.     In May 2022, Miller attended a Huron Leadership Conference in Las Vegas, Nevada, where Curt Whelan (Caucasian male), Managing Director and Healthcare Portfolio Strategy Leader, made a culturally insensitive comment, at best, after an attendee asked Jim Gallas (Caucasian male), Managing Director for Healthcare Practice, about Huron's lack of diversity within their ranks at the senior level.

53.     In response to the question about lack of cultural diversity, Whelan replied that he is a minority, having had to struggle growing up poor. Whelan's comments drew an outcry from company minorities and spurred numerous reports to HR about the racially, culturally, and diversity-insensitive comment.

54.     The next day, Jim Gallas said to everyone in attendance at the conference that Whelan's "words didn't land well" in response to the complaints HR received about the comment.

55.     The following day, while checking out from the conference, Miller complained directly to Huron President Mark Hussey (Caucasian male) about the racially insensitive comment and shared with him Huron's lack of diversity and inclusiveness, as well as the lack of

promotional opportunities for minorities like herself despite promises made before and after her hire.

56.     Despite Huron's clearly racially and culturally insensitive and oppressive environment, Miller was still eager to succeed at Huron and reached out to a Diversity, Equity, and Inclusion (DEI) representative and set up a meeting with Managing Director Saraka Amin, who was also interested in advancing the company's DEI efforts. Despite Amin taking the DEI initiative to her manager separately in January 2023, the DEI project was never pursued by Huron executives.

***Additional Racially Insensitive Comments and Failure to Implement Corrective Measures***

57.     On another occasion, Plaintiff participated in a video conference call with members of her team, representatives from Defendants, and members of a client's board of directors. The purpose of the call was to assess why the client's board had voted against acquiring a healthcare facility.

58.     During the call, one board member stated that he had voted against the acquisition because "he didn't want fat black people in the ER."

59.     At some point, another board member responded by stating he "doesn't have a problem because his daughter is married to a black guy."

60.     Plaintiff, who is African American, was present on the call with her video on and heard these racially discriminatory statements directly.

61.     No one on the call, including Plaintiff's supervisors or other representatives from Defendants, objected to or challenged these racist remarks during the call.

62.     The call continued for approximately twenty (20) additional minutes after these statements were made.

63. Following the call, the client's manager, spoke with Plaintiff a privately acknowledging that the statements were inappropriate and expressing that she was sorry Plaintiff "had to hear that."

64. Despite the client's manager's acknowledgment that the statements were inappropriate, Defendants took no further action in response to the incident.

65. Defendants failed to investigate the incident, failed to take any corrective action, and failed to implement any measures to ensure that Plaintiff would not be subjected to similar racially discriminatory conduct in the future.

*Additional Evidence of Discriminatory Treatment*

66. In October 2022, Mr. Anthony reached out to Miller for help in his recruitment efforts, and during their discussions Miller inquired as to why she was passed over for the Principal position given to Eileen Gillespie despite Miller's extensive experience in implementation, sales, and leadership. Anthony replied that Gillespie had more extensive sales experience when, in fact, Gillespie had no more or less sales experience than Miller.

*Formal Complaint and Subsequent Retaliation*

67. In November 2022, Miller filed a formal complaint with Huron HR alleging race discrimination after Senior Director Alex Knewston (Caucasian male) was assigned as the overall lead on the NYHHS project and Miller was assigned to report to him. By all accounts from Huron employees (Sonea Tartan, Managing Director (non-African American), and Sara Cenci, Senior Director (Caucasian female)), Knewston had no experience or business leading a project of this magnitude and had no frame of reference to lead an atypical project that Huron had to build from day one.

12

68.     After an alleged Huron investigation, no finding of discrimination was made, but Miller was told she could "co-lead" on the project with Knewston.

69.     On or about November 2022, after Plaintiff complained of racial discrimination to Huron HR and senior leadership, she began experiencing increased scrutiny and was denied key project leadership opportunities.

70.     In December 2022, Miller learned in a call with Senior Director Keilana Frank that Frank had been a Senior Director for seven (7) years and had been denied all sales/oral presentation opportunities required to get promoted at Huron.

71.     Over the next two years, Huron continued to deny Plaintiff equal access to sales, projects, mentorship, and advancement opportunities.

***Pattern and Practice of Discrimination Against African Americans***

72.     Throughout Miller's tenure with Huron, the following non-African American comparators, with less experience and hired shortly before or after Miller, were promoted to Managing Directors: Maggie Barlow Parker (Caucasian female); Dan Callahan (Caucasian male); Martin Bloomenkrantz (Caucasian male); Isaac Segal (Caucasian male); Katie Clark (Caucasian female); Chris Kerby (Caucasian male); Kathrina Kozlova (Caucasian female, promoted to Principal); Austen Meier (Caucasian male); Brenda Grill (Caucasian female); Jennifer Miller (Caucasian female); Madeleine McChesney (Caucasian female); and Andy Weihmiller (Caucasian male).

73.     The only African American promoted to Managing Director in Huron's recent history was Jacquelyn Gaines, who had been at Huron for 12 years before promotion.

74.     Further, throughout Miller's tenure with Huron, the following similarly situated African American employees were subjected to similar discrimination and disparate treatment

and denied promotions/advancement within Huron: Senior Director Keilana Frank (MBA); Gaines Black; Matthew Berkley (MBA, MPH); Iesha Heyward (MHA); Alexis Banner (RN, MBA); Kristine Rucker (DHA, MBA); Ed Monestine; Matt Jones; Ernest Torain (JD); Ida Quamina; Marc Marshall; Mychal Harrison; Bianca Mason; Adwoa John; Doreen Ireland; Ken Readus; and April Harris.

***Statistical Evidence of Systemic Race Discrimination***

75.     Based on current data, Huron's demographics, particularly in management and senior-level positions, demonstrate pervasive and systematic discrimination. African-American employees are significantly underrepresented at Huron. Of the 54 Senior Directors at Huron, 51 are Caucasian (94.4%) and only 3 are African American (5.6%). The numbers are even worse at the Managing Director and Principal levels. Of the 230 Managing Directors, approximately 206 are Caucasian (89.6%) and only 2 are African American (0.9%). Of the 54 Principals, 48 are Caucasian (88.9%) and only 1 Principal is African American (1.9%).[1]

76.     This underrepresentation appears stark when compared to the available labor market data. According to the U.S. Bureau of Labor Statistics ("BLS"), Black or African American professionals make up 8.4% of "Management analysts," the category under which consultants are classified.[2] Huron's demonstrated figures for their senior-level positions (0.9% of Managing Directors, 1.9% of Principals, and 5.6% of Senior Directors) fall significantly below this general market benchmark. Furthermore, this gap becomes even more significant when compared to the more specific BLS category of "Medical and health services managers." Given

---

[1] Based on current demographic data as of November 13, 2025 from Huron website; https://www.huronconsultinggroup.com/company/experts.
[2] U.S. Bureau of Labor Statistics (BLS), 2024: Employed persons by detailed occupation, sex, race, and Hispanic or Latino ethnicity; https://www.bls.gov/cps/cpsaat11.htm

Huron's heavy concentration in healthcare, this category is a highly relevant labor market benchmark, and it reports that 14.2% of professionals are Black or African American.[3]

77.     Despite some improvement in their recruitment of African Americans to higher-level positions in the Company, Huron has not made serious efforts to rectify the racial imbalance of their workforce and, like Miller, has systematically excluded African Americans from opportunities to qualify for promotion.

78.     Miller was passed over for promotion opportunities in favor of Caucasian employees, both male and female, with lesser education and experience.

79.     Miller was denied promotion because she was denied participation in sales programs required to qualify for promotion. Additionally, Miller was denied hire as Principal, for which she was qualified, but the position was given to Gillespie, a Caucasian female.

80.     While pattern and practice claims are typically pursued as class actions under Rule 23 of the Federal Rules of Civil Procedure, pattern and practice evidence is permissible under the law to support an individual's disparate treatment claims, with the statistical evidence being probative. See *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977); *Johns v. Village of Sauk Village*, 98 F. Supp. 2d 968 (N.D. Ill. 2000); *Hamilton v. Summers*, 95 F. Supp. 2d 908 (N.D. Ill. 2000*); Ames v. Ohio Dept. of Youth Servs*., No. 23-1039 (U.S. June 5, 2025).

81.     Here, Defendants engaged in a systematic pattern and practice to deny jobs and/or promotions not only to Plaintiff but to other qualified African Americans. Huron's conduct was their standard operating procedure rather than isolated incidents.

---

[3] *Id.*

*Termination Following Medical Leave*

82.     As a direct and proximate result of Defendants' discriminatory acts against Plaintiff—including their failure to provide promised training and mentorship, denial of sales opportunities necessary for promotion, denial of promotional opportunities, and racially insensitive work environment following her complaints—Plaintiff suffered stress and anxiety that resulted in her seeking medical treatment.

83.     As a direct and proximate result of the stress and anxiety suffered by Plaintiff, on or about April 17, 2023, Plaintiff's healthcare provider placed her on medical leave.

84.     On or about December 1, 2023, approximately 13 months after Plaintiff filed her formal complaint with HR about race discrimination, Huron terminated Plaintiff's employment. Defendants' stated reason for termination—that Plaintiff's healthcare provider would not clear her to return to work—was pretextual. Plaintiff's medical condition was directly caused by Defendants' race discrimination. The termination decision was the culmination of Defendants' pattern of race-based adverse actions beginning in 2021 following Plaintiff's May 2022 and November 2022 complaints about discrimination.

**JOINT EMPLOYER AND INTEGRATED ENTERPRISE LIABILITY**

85.     At all times relevant, Defendants HCG and HCS operated as joint employers and/or as a single integrated enterprise with respect to Plaintiff's employment.

86.     HCG, as the publicly traded entity and public face of the "Huron" organization, exercised significant and substantial control over the terms and conditions of Plaintiff's employment.

87.     HCG and HCS, as affiliates under a common holding company structure, shared interrelated operations, common management, centralized control of labor relations, and

common ownership through their holding company. The management of HCG actively participated in and directed employment decisions affecting Plaintiff, including discriminatory decisions regarding promotion, mentorship, training, sales opportunities, and ultimately Plaintiff's termination.

88.     HCG and HCS failed to maintain separate corporate identities with respect to employment matters and operated as alter egos of one another. They presented themselves to Plaintiff and the public as a single unified entity through their shared website (www.huronconsultinggroup.com), unified branding, shared management, and integrated operations.

89.     Plaintiff's professional biography was featured on HCG's website at www.huronconsultinggroup.com, reinforcing the unified corporate identity and Plaintiff's reasonable belief that she was employed by HCG. Defendants made no effort to distinguish HCG from HCS in their dealings with Plaintiff or in their public-facing materials.

90.     The complex corporate structure, in which HCG (the publicly traded entity) and HCS (the operating affiliate) both function as affiliates under a common holding company, obscured from Plaintiff which specific legal entity was her employer. Defendants intentionally presented themselves as a single unified organization operating under the "Huron" brand, with HCG serving as the primary public identity of that organization.

91.     Both Defendants are jointly and severally liable for the discriminatory conduct alleged herein.

## CAUSES OF ACTION

## COUNT ONE
**(Discrimination on the Basis of Race)**
*Violation of Title VII, 42 U.S.C. §2000e, et seq., & Illinois Human Rights Act*
Against Defendants Huron

92.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

93.     At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq.

94.     Defendants are both an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), at all relevant times, employing more than 15 employees.

95.     Plaintiff is an African American and therefore a member of a protected class under Title VII.

96.     During the course of Plaintiff's employment with Defendants, Defendants, by and through their agents and employees, discriminated against Plaintiff in the terms, conditions, and privileges of employment in various ways because of her race (African American), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and the Illinois Human Rights Act.

97.     Specifically, Defendants discriminated against Plaintiff because of her race by:

a.      Recruiting her for a Managing Director or Principal position but hiring her at the lower Senior Director level despite her superior qualifications;

b.      Failing to provide the promised training, mentorship, and shadowing that were provided to similarly situated Caucasian Senior Directors;

18

c.       Denying her access to sales opportunities and client relationships necessary to qualify for promotion while providing such opportunities to less qualified Caucasian Senior Directors;

d.       Removing her from project leadership roles in favor of less qualified Caucasian employees;

e.       Denying her promotions to Managing Director and Principal positions while promoting less qualified Caucasian employees; and

f.       Subjecting her to a racially insensitive and hostile work environment;

98.     Each of the following adverse employment actions was motivated by Plaintiff's race:

a.       Huron denied Plaintiff the Managing Director position because of her race, as evidenced by the fact that it hired Eileen Gillespie, a Caucasian female with comparable or less experience, for a Principal position instead.

b.       Huron failed to provide Plaintiff with promised training and mentorship because of her race, while providing such support to Caucasian Senior Directors.

c.       Huron denied Plaintiff access to sales opportunities necessary for promotion because of her race, creating a discriminatory "catch-22" that prevented her advancement.

99.     Similarly situated employees who were not members of Plaintiff's protected class were treated more favorably than Plaintiff in similar circumstances. Caucasian Senior Directors hired around the same time as Plaintiff received meaningful mentorship, training, shadowing, sales opportunities, and were promoted to Managing Director within 2-3 years, while Plaintiff was systematically denied these opportunities.

100.     Defendants' discriminatory conduct created an intimidating, oppressive, hostile, and offensive work environment which interfered with Plaintiff's emotional and physical well-being.

101.     As a result of the hostile and offensive work environment perpetrated by Defendants and their agents, and Defendants Huron's failure to protect Plaintiff from such discrimination, Plaintiff suffered humiliation, emotional distress, and physical injury.

102.     Defendants Huron, by and through their agents and supervisors, failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act of their employees as described above.

103.     Defendants Huron and their agents failed to take all reasonable and necessary steps to eliminate the race discrimination in the workplace and to prevent it from occurring in the future.

104.     Despite receiving multiple complaints from minorities at the May 2022 conference about racially insensitive comments, Huron's only response was to state that the words "didn't land well."

105.     Huron failed to discipline the offending employees, failed to provide meaningful training, and allowed the discriminatory pattern and practice to continue.

106.     As a further direct and proximate result of Defendants Huron's violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

**COUNT TWO**
**(Discrimination on the Basis of Race)**
*Violation of 42 U.S.C. §1981*
Against Defendants Huron

107.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

108.    At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to 42 U.S.C. §1981.

109.    Plaintiff is an African American and therefore a member of a protected class under 42 U.S.C. § 1981.

110.    Defendants Huron are both corporations engaged in an industry affecting interstate commerce and employed Plaintiff during the events described herein.

111.    Section 1981 guarantees all persons within the United States the same right to make and enforce contracts as is enjoyed by Caucasian citizens, including the making, performance, modification, and termination of employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

112.    During the course of Plaintiff's employment with Defendants, Defendants, by and through their agents and employees, discriminated against Plaintiff in the terms, conditions, and privileges of her employment contract because of her race (African American), in violation of 42 U.S.C. § 1981.

113.    Defendants discriminated against Plaintiff in the terms, conditions, and enforcement of her employment contract, including compensation, training, advancement opportunities, project assignments, and continued employment—all of which were less favorable than those provided to similarly situated Caucasian employees.

21

114.    But for Plaintiff's race, she would have been hired at the Managing Director or Principal level for which she was recruited and qualified, would have been provided the promised training and mentorship, would have been given access to sales opportunities necessary for promotion, would have been promoted to Managing Director or Principal.

115.    Specifically, Defendants discriminated against Plaintiff because of her race by:

a.    Failing to hire her for a Managing Director or Principal position for which she was qualified and for which she was recruited;

b.    Denying her the training, mentorship, and shadowing guaranteed to her upon hire and routinely provided to similarly situated Caucasian Senior Directors;

c.    Denying her sales assignments and client relationship opportunities that were prerequisites for promotion, while providing such opportunities to Caucasian Senior Directors;

d.    Subjecting her to racially and culturally insensitive comments and a hostile work environment;

e.    Removing her from project leadership roles; and

f.    Denying her promotions while promoting less qualified Caucasian employees.

116.    Similarly situated employees who were not members of Plaintiff's protected class were treated more favorably than Plaintiff in similar circumstances. Caucasian Senior Directors received extensive training, mentorship, sales opportunities, and were promoted in 2-3 years, while Plaintiff was systematically denied these contractual benefits because of her race.

117.    Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

22

118.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer loss of income and benefits, including lost promotional opportunities and the difference between her actual compensation as Senior Director and what she would have earned as Managing Director or Principal, emotional distress, humiliation, and other damages.

119.     As a further direct and proximate result of Defendants Huron's violation of 42 U.S.C. § 1981 as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

120.     Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

**COUNT THREE**
**(Failure to Hire/Promote based on Race)**
*Violation of Title VII, 42 U.S.C. §2000e, et seq. & Illinois Human Rights Act*
Against Defendants Huron

121.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

122.     At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq.

123.     At all relevant times, Defendants was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

124. Plaintiff is an African American and therefore a member of a protected class under Title VII.

125. Defendants' discrimination began at the hiring stage when, despite recruiting Plaintiff for a Managing Director or Principal position and Plaintiff being qualified for such positions based on her education, experience, and qualifications, Defendants instead hired her at the lower-level Senior Director position. Defendants' discrimination continued throughout Plaintiff's employment by repeatedly failing to promote Plaintiff to Managing Director or Principal despite her qualifications, while promoting less qualified Caucasian employees.

126. During Plaintiff's application process and employment with Defendants beginning in 2021, Defendants had available Managing Director and Principal positions for which Plaintiff was qualified, but Defendants failed or refused to hire and/or promote Plaintiff to Managing Director or Principal.

127. Throughout 2022 and 2023, Plaintiff expressed her interest in promotion to Managing Director and Principal positions to her supervisors and was qualified for such positions, but Huron failed to promote her.

128. In May 2022, Defendants hired Eileen Gillespie for a Principal position even though Plaintiff was equally or more qualified for the position. Gillespie had only 3.5 years at Ernst & Young, while Plaintiff had over seven (7) years of healthcare consulting and sales experience at Grant Thornton, Infor Healthcare, and Amazon Web Services (AWS) in higher-level roles.

129. Defendants' stated reason for not hiring or promoting Plaintiff—that she allegedly lacked sales experience—was pretextual, as Plaintiff had over seven (7) years of sales experience from previous employers and Defendants intentionally and systematically denied her the sales

24

opportunities at Huron that were required for promotion. This created a discriminatory "catch-22" designed to prevent Plaintiff's advancement because of her race.

130.    In 2021, Huron promoted from within applicants for Managing Director positions with qualifications similar to or less than Plaintiff's qualifications.

131.    In 2022 and throughout 2023, Huron continued to seek internal applicants for promotion to Managing Director and Principal positions and promoted numerous applicants outside Plaintiff's protected class with lesser experience and qualifications.

132.    Throughout Miller's tenure with Huron, the following non-African American comparators, with less experience than Miller and hired shortly before or after Miller, were promoted to Managing Directors: Maggie Barlow Parker (Caucasian female); Dan Callahan (Caucasian male); Martin Bloomenkrantz (Caucasian male); Isaac Segal (Caucasian male); Katie Clark (Caucasian female); Chris Kerby (Caucasian male); Kathrina Kozlova (Caucasian female, promoted to Principal); Austen Meier (Caucasian male); Brenda Grill (Caucasian female); Jennifer Miller (Caucasian female); Madeleine McChesney (Caucasian female); and Andy Weihmiller (Caucasian male).

133.    Defendants instead hired and/or promoted individuals outside Plaintiff's protected racial group who were similarly situated or less qualified than Plaintiff.

134.    Defendants have engaged in a pattern and practice of favoring non-African American employees and applicants in hiring and promotional decisions, as demonstrated by the statistical evidence that only 0.9% of Managing Directors and 1.9% of Principals are African American, despite African Americans comprising 5.6% of Senior Directors.

135.    Further, throughout Miller's tenure with Huron the following similarly situated African American employees were subjected to similar discrimination and disparate treatment

25

and denied promotions/advancement within Huron: Keilana Frank (MBA); Gaines Black; Matthew Berkley (MBA MPH); Iesha Heyward (MHA); Alexis Banner (RN MBA); Kristine Rucker (DHA MBA); Ed Monestine; Matt Jones; Ernest Torain (JD); Ida Quamina; Marc Marshall; Mychal Harrison; Bianca Mason; Adwoa John; Doreen Ireland; Ken Readus; and April Harris.

136.     Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

137.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer loss of income and benefits, including lost promotional opportunities, emotional distress, humiliation, and other damages.

138.     As a further direct and proximate result of Defendants' violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

139.     Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

## COUNT FOUR
### (Failure to Hire/Promote based on Race)
*Violation of 42 U.S.C. § 1981*
Against Defendants Huron

140.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

141. At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to 42 U.S.C. §1981.

142. Plaintiff is a member of a protected class, African American, under 42 U.S.C. § 1981.

143. Defendants Huron is a corporation engaged in an industry affecting interstate commerce and employed Plaintiff during the events described herein.

144. Section 1981 guarantees all persons within the United States the same right to make and enforce contracts as is enjoyed by Caucasian citizens, including the making, performance, modification, and termination of employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

145. During the course of Plaintiff's application process and employment with Defendants, Defendants, by and through their agents and employees, discriminated against Plaintiff in hiring and promotional opportunities because of her race (African American), in violation of 42 U.S.C. § 1981.

146. But for Plaintiff's race, she would have been hired at the Managing Director or Principal level for which she was recruited and qualified, and would have been promoted to Managing Director or Principal during her tenure at Huron.

147. Plaintiff was recruited for and qualified for a Managing Director or Principal position. Applications and opportunities for hire and promotion to Managing Director and Principal positions were available in 2021 and throughout 2023.

148. Plaintiff was denied hire to a Managing Director or Principal position in 2021, and promotions to those positions for which Plaintiff was qualified were denied throughout 2022 and 2023.

149.    In May 2022, Defendants hired Eileen Gillespie, a Caucasian female, for a Principal position even though Plaintiff was more qualified for the position.

150.    In 2021, Huron promoted from within applicants for Managing Director and Principal positions with qualifications similar to or less than Plaintiff's qualifications.

151.    In 2022 and throughout 2023, Huron continued to seek internal applicants for promotion to Managing Director and Principal positions and promoted numerous Caucasian applicants with lesser experience and qualifications than Plaintiff.

152.    Throughout Miller's tenure with Huron, the following non-African American comparators, with less experience than Miller and hired shortly before or after Miller, were promoted to Managing Directors: Maggie Barlow Parker (Caucasian female); Dan Callahan (Caucasian male); Martin Bloomenkrantz (Caucasian male); Isaac Segal (Caucasian male); Katie Clark (Caucasian female); Chris Kerby (Caucasian male); Kathrina Kozlova (Caucasian female, promoted to Principal); Austen Meier (Caucasian male); Brenda Grill (Caucasian female); Jennifer Miller (Caucasian female); Madeleine McChesney (Caucasian female); and Andy Weihmiller (Caucasian male).

153.    Defendants instead hired and/or promoted Caucasian individuals who were similarly situated or less qualified than Plaintiff.

154.    Defendants' stated reasons for failing to hire or promote Plaintiff were pretextual and designed to conceal unlawful discrimination. Defendants claimed Plaintiff lacked sales experience but hired Gillespie with comparable or less sales experience, and Defendants systematically denied Plaintiff access to sales opportunities at Huron while providing such opportunities to Caucasian Senior Directors.

155.    Defendants have engaged in a pattern and practice of favoring non-African American employees and applicants in hiring and promotional decisions.

156.    Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

157.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer loss of income and benefits, including lost promotional opportunities and the difference between her actual compensation and what she would have earned at the higher level, emotional distress, humiliation, and other damages.

158.    As a further direct and proximate result of Defendants' violation of 42 U.S.C. § 1981 as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

159.    Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

## **COUNT FIVE**
### **(Failure to Train based on Race)**
*Violation of Title VII 42 U.S.C. §2000e, et seq. & Illinois Human Rights Act*
Against Defendants Huron

160.    Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

161.    At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq.

162.    At all relevant times, Defendants were an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b).

163.    Plaintiff is an African American and therefore a member of a protected class under Title VII and the Illinois Human Rights Act.

164.    Plaintiff was employed by Defendants and performed her job duties in a satisfactory manner and met Defendants' legitimate performance expectations, as evidenced by her "meets expectations" performance reviews, salary increases, bonuses, and receipt of the Huron Spot Award in October 2022.

165.    Defendants provided on-the-job training, mentorship programs, shadowing opportunities, and formal training opportunities to their Senior Director employees, including training and mentorship necessary for advancement, promotion, and performance improvement.

166.    Upon accepting the Senior Director position in October 2021, Plaintiff was expressly promised by Huron Director of Recruiting Gabriel Anthony that she would: (a) be partnered with a managing director to guide her and set her up for promotion; (b) be assigned to a mentor program; and (c) receive on-the-job training and shadowing for project implementation work. Senior Director Keilana Frank confirmed that Huron had an established program to partner senior directors with managing directors to ensure they are on track for promotion.

167.    Despite these express promises, Defendants intentionally failed and/or refused to provide Plaintiff with the same training, mentorship, and shadowing opportunities that were routinely made available to similarly situated Caucasian Senior Directors.

168.    Specifically, although Plaintiff was assigned Martin Bloomenkrantz (Caucasian male) as her peer coach and mentor, Bloomenkrantz never meaningfully mentored Plaintiff.

After one brief meeting on December 3, 2021, Bloomenkrantz only made himself available if Plaintiff reached out to him, rather than providing the proactive mentorship promised.

169.    Although Plaintiff was told she would shadow Senior Director Maureen Hydok (Caucasian female) on her first project at Christ Community Center in December 2021, Hydok met with Plaintiff for only approximately 30 minutes before instructing Plaintiff to take the lead on the project. No shadowing or mentoring was provided.

170.    Throughout 2022 and 2023, Huron failed to provide Plaintiff with any meaningful training, support, or guidance from Bloomenkrantz, Hydok, Michelle Dziwnionkowski (her onboarding specialist), or any other Huron executive, despite the promises made to her as a condition of accepting the lower-level Senior Director position.

171.    Defendants provided extensive training, mentorship, and shadowing opportunities to Caucasian Senior Directors with less experience or similar seniority to Plaintiff, while systematically denying Plaintiff access to these same programs and resources.

172.    Defendants' differential treatment in providing training is demonstrated by the fact that Caucasian Senior Directors hired around the same time as Plaintiff were promoted to Managing Director within 2-3 years, while Plaintiff—who was denied the training required for promotion—was never promoted despite her superior qualifications.

173.    The denial of training opportunities adversely affected Plaintiff's ability to learn Huron's methodologies, develop required skills, qualify for promotions, and advance within the company. Defendants created a discriminatory "catch-22" whereby Plaintiff was told she needed certain experience and training to be promoted, but was systematically denied access to the training and opportunities that would have provided that experience.

174.    Defendants' refusal to provide Plaintiff with equal training opportunities, despite express promises to do so, was motivated by unlawful racial discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the Illinois Human Rights Act.

175.    Defendants' conduct was part of a pattern and practice of denying training and developmental opportunities to African American Senior Directors while providing such opportunities to Caucasian Senior Directors, as evidenced by the fact that only one African American (Jacquelyn Gaines) has been promoted to Managing Director in recent history, and only after 12 years, compared to Caucasian Senior Directors who are routinely promoted within 2-3 years.

176.    As a direct and proximate result of Defendants' discriminatory failure to train, Plaintiff suffered loss of income from denied promotional opportunities, diminished career development, emotional distress, humiliation, and other damages.

177.    Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

178.    As a further direct and proximate result of Defendants' violation of Title VII of the Civil Rights Act of 1964 and the Illinois Human Rights Act as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

179.    Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

**COUNT SIX**
**(Failure to Train based on Race)**
*In Violation of 42 U.S.C. §1981*
Against Defendants Huron

180.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

181.     At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to 42 U.S.C. § 1981.

182.     Plaintiff is a member of a protected class, African American, under 42 U.S.C. § 1981.

183.     Defendants Huron is a corporation engaged in an industry affecting interstate commerce and employed Plaintiff during the events described herein.

184.     Section 1981 guarantees all persons within the United States the same right to make and enforce contracts as is enjoyed by Caucasian citizens, including the making, performance, modification, and termination of employment contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

185.     Plaintiff was employed by Defendants and performed her job duties in a satisfactory manner and met Defendants' legitimate performance expectations, as evidenced by her "meets expectations" performance reviews, salary increases, bonuses, and receipt of the Huron Spot Award in October 2022.

186.     Defendants provided on-the-job training, mentorship programs, shadowing opportunities, and formal training opportunities to their Senior Director employees, including training and mentorship necessary for advancement, promotion, and performance improvement.

187.     Upon accepting the Senior Director position in October 2021, Plaintiff was expressly promised by Huron Director of Recruiting Gabriel Anthony that she would: (a) be

33

partnered with a managing director to guide her and set her up for promotion; (b) be assigned to a mentor program; and (c) receive on-the-job training and shadowing for project implementation work. Senior Director Keilana Frank confirmed that Huron had an established program to partner senior directors with managing directors to ensure they are on track for promotion.

188.    Despite these express promises, Defendants intentionally failed and/or refused to provide Plaintiff with the same training, mentorship, and shadowing opportunities that were routinely made available to similarly situated Caucasian Senior Directors.

189.    Specifically, although Plaintiff was assigned Martin Bloomenkrantz (Caucasian male) as her peer coach and mentor, Bloomenkrantz never meaningfully mentored Plaintiff. After one brief meeting on December 3, 2021, Bloomenkrantz only made himself available if Plaintiff reached out to him, rather than providing the proactive mentorship promised.

190.    Although Plaintiff was told she would shadow Senior Director Maureen Hydok (Caucasian female) on her first project at Christ Community Center in December 2021, Hydok met with Plaintiff for only approximately 30 minutes before instructing Plaintiff to take the lead on the project. No shadowing or mentoring was provided.

191.    Throughout 2022 and 2023, Huron failed to provide Plaintiff with any meaningful training, support, or guidance from Bloomenkrantz, Hydok, Michelle Dziwnionkowski (her onboarding specialist), or any other Huron executive, despite the promises made to her as a condition of accepting the lower-level Senior Director position.

192.    Defendants provided extensive training, mentorship, and shadowing opportunities to Caucasian Senior Directors with less experience or similar seniority to Plaintiff, while systematically denying Plaintiff access to these same programs and resources.

193.    Defendants' differential treatment in providing training is demonstrated by the fact that Caucasian Senior Directors hired around the same time as Plaintiff were promoted to Managing Director within 2-3 years, while Plaintiff—who was denied the training required for promotion—was never promoted despite her superior qualifications.

194.    The denial of training opportunities adversely affected Plaintiff's ability to learn Huron's methodologies, develop required skills, qualify for promotions, and advance within the company. Defendants created a discriminatory "catch-22" whereby Plaintiff was told she needed certain experience and training to be promoted, but was systematically denied access to the training and opportunities that would have provided that experience.

195.    Defendants' refusal to provide Plaintiff with equal training opportunities, despite express promises to do so, was motivated by unlawful racial discrimination in violation of 42 U.S.C. § 1981.

196.    Defendants' conduct was part of a pattern and practice of denying training and developmental opportunities to African American Senior Directors while providing such opportunities to Caucasian Senior Directors, as evidenced by the fact that only one African American (Jacquelyn Gaines) has been promoted to Managing Director in recent history, and only after 12 years, compared to Caucasian Senior Directors who are routinely promoted within 2-3 years.

197.    As a direct and proximate result of Defendants' discriminatory failure to train, Plaintiff suffered loss of income from denied promotional opportunities, diminished career development, emotional distress, humiliation, and other damages.

198.    Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

199. As a further direct and proximate result of Defendants' violation of 42 U.S.C. § 1981 as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

200. Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

## COUNT SEVEN
### (Disparate Treatment Based on Race)
*In Violation of 42 U.S.C. §1981*
Against Defendants Huron

201. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

202. At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to 42 U.S.C. § 1981.

203. Plaintiff was employed by Defendants as a Senior Director from October 25, 2021 to December 1, 2023.

204. Plaintiff is a member of a racial minority (African American) and, as such, is protected under 42 U.S.C. § 1981 from racial discrimination in the making and enforcement of contracts, including employment contracts.

205. Section 1981 prohibits intentional discrimination in the terms and conditions of contractual relationships on the basis of race.

36

206. During Plaintiff's employment, Defendants intentionally treated Plaintiff less favorably than similarly situated Caucasian employees in the terms, conditions, privileges, and benefits of her employment contract, including but not limited to:

      a. Assignments to high-visibility projects and leadership opportunities;

      b. Access to training, mentorship, and professional development;

      c. Access to sales opportunities and client relationships;

      d. Performance evaluations and feedback;

      e. Compensation, bonuses, and other financial benefits;

      f. Promotional opportunities and career advancement;

      g. Support from management and supervisors; and

      h. Job security and continued employment.

207. Plaintiff was qualified for her position and performed her job duties in a satisfactory manner, receiving "meets expectations" performance reviews, salary increases, bonuses, and the Huron Spot Award.

208. The disparate treatment described above was taken by Defendants against Plaintiff on the basis of her race.

209. Similarly situated Caucasian employees were treated more favorably by Defendants in nearly identical circumstances. Caucasian Senior Directors hired at the same time as Plaintiff received meaningful mentorship, were given sales opportunities, were not removed from project leadership roles, were promoted to Managing Director within 2-3 years, and were not terminated.

210.    But for Plaintiff's race, she would have received the same favorable treatment as similarly situated Caucasian employees, including training, mentorship, sales opportunities, promotions, and continued employment.

211.    Defendants' actions constitute intentional discrimination on the basis of race in violation of 42 U.S.C. § 1981, as Plaintiff was denied the right to make and enforce her employment contract on equal terms with Caucasian employees.

212.    Defendants' disparate treatment of Plaintiff was part of a pattern and practice of racial discrimination, as evidenced by the statistical disparity in the representation of African Americans at senior levels and the systematic denial of promotional opportunities to multiple African American Senior Directors.

213.    As a direct and proximate result of Defendants' unlawful disparate treatment, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish, loss of enjoyment of life, and other non-economic damages, as well as lost wages, lost promotional opportunities, and lost benefits.

214.    Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

215.    As a further direct and proximate result of Defendants' discriminatory and harassing actions as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

216.    Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for

Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

## COUNT EIGHT
### (Disparate Treatment Based on Race)
*In Violation of Title VII, 42 U.S.C. § 2000e, et seq. & Illinois Human Rights Act*
Against Defendants Huron

217.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

218.     At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq.

219.     At all relevant times, Defendants were and are an "employer" as defined by 42 U.S.C. § 2000e(b).

220.     At all relevant times, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 2000e.

221.     Plaintiff is a member of a protected class under Title VII and the Illinois Human Rights Act on the basis of her race, African American.

222.     Title VII and the Illinois Human Rights Act make it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."

223.     Defendants, through their agents, supervisors, and/or management-level employees, intentionally treated Plaintiff less favorably than similarly situated Caucasian

employees outside of her protected class with respect to the terms, conditions, and privileges of employment, including but not limited to:

      a.   Project assignments and leadership opportunities;

      b.   Training, mentorship, and professional development;

      c.   Sales opportunities and business development activities;

      d.   Access to senior leadership and networking opportunities;

      e.   Performance evaluations and constructive feedback;

      f.   Recognition and awards (despite receiving the Spot Award, Plaintiff was not given commensurate advancement opportunities);

      g.   Promotional opportunities and career advancement; and

      h.   Job security and protection from termination.

224.     Similarly situated Caucasian Senior Directors were treated more favorably under nearly identical circumstances. Caucasian Senior Directors hired around the same time as Plaintiff with similar or lesser qualifications received:

      a.   Meaningful mentorship from Managing Directors;

      b.   Shadowing opportunities on major projects;

      c.   Access to sales opportunities necessary for promotion;

      d.   Promotions to Managing Director within 2-3 years;

      e.   Continued employment even when taking extended leave.

225.     Defendants' disparate treatment of Plaintiff was not based on any legitimate, nondiscriminatory reason but was motivated by Plaintiff's race.

226.     The disparate treatment was severe and pervasive throughout Plaintiff's employment, beginning with being hired at a lower level than the position for which she was

recruited, continuing through systematic denial of training and opportunities, and culminating in her termination while on medical leave caused by Defendants' discrimination.

227. Defendants' conduct constitutes unlawful disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), and the Illinois Human Rights Act.

228. As a direct and proximate result of Defendants' unlawful disparate treatment, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish, loss of enjoyment of life, and other non-economic damages, as well as lost wages, lost promotional opportunities, and lost benefits.

229. Defendants' discriminatory conduct was intentional, willful, and in reckless disregard of Plaintiff's federally protected rights.

230. As a further direct and proximate result of Defendants' discriminatory actions as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce her rights and has thereby incurred and will continue to incur legal fees and costs.

231. Plaintiff is informed and believes, and based thereon alleges, that Defendants' conduct as described above was willful, wanton, malicious, and done in reckless disregard for Plaintiff's rights. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in an amount according to proof at trial.

232. Plaintiff is informed and believes, and based thereon alleges, that the Defendants' conduct as described above was willful, wanton, malicious and done in reckless disregard for the safety and well-being of Plaintiff. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in the sum according to proof at trial.

## COUNT NINE
### (Hostile Work Environment)
*Violation of Title VII, 42 U.S.C. 2000(e), 42 U.S.C. §1981, and the Illinois Human Rights Act*
Against Defendants Huron

233.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

234.     At all relevant times, Defendants HCG and HCS were Plaintiff's joint employers and are subject to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., the Illinois Human Rights Act, 775 ILCS 5/1-101, et seq, and 42 U.S.C. §1981.

235.     Plaintiff is African American and a member of a protected class under Title VII,§1981 and the Illinois Human Rights Act.

236.     During her employment with Defendants, Plaintiff was subjected to severe and pervasive harassment based on her race that altered the terms and conditions of her employment and created an abusive working environment.

237.     The harassment Plaintiff endured was both subjectively offensive to Plaintiff and objectively offensive such that a reasonable person in Plaintiff's position would have found the work environment hostile and abusive.

238.     Specifically, Plaintiff was subjected to unwelcome harassment including, but not limited to:

     a.     Plaintiff participated in a video conference call with members of her team, representatives from Defendants, and members of a client's board of directors. During this professional business meeting, a board member stated that he had voted against a healthcare facility acquisition because "he didn't want fat black people in the ER." Another board member responded by stating he "doesn't have a problem because his

daughter is married to a black guy." Plaintiff, who is African American, was visibly present on the call with her video on and heard these explicitly racist statements directly.

b.     No one on the call, including Plaintiff's supervisors and other representatives from Defendants who were present, objected to or challenged these racist remarks during the call. The call continued for approximately twenty additional minutes after these statements were made, forcing Plaintiff to remain in this hostile environment.

c.     Following the call, the client's manager,  spoke with Plaintiff privately, acknowledging that the statements were inappropriate and expressing that she was sorry Plaintiff "had to hear that." Despite this acknowledgment, Defendants took no further action in response to the incident. Defendants failed to investigate the incident, failed to take any corrective action, and failed to implement any measures to ensure that Plaintiff would not be subjected to similar racially discriminatory conduct in the future.

d.     Plaintiff was treated less favorably than similarly situated Caucasian employees.

e.     Plaintiff was excluded from projects and advancement opportunities based on her race, while similarly situated Caucasian employees were afforded these opportunities.

239.     The racist statements made during the video conference call were severe enough, standing alone, to alter the conditions of Plaintiff's employment and create an abusive working environment. The statements explicitly referenced race in a derogatory manner, were made during a professional business meeting, were humiliating to Plaintiff as an African American woman present on the call, and were ratified by Defendants through their supervisors' silence and subsequent failure to take any corrective action.

240. The harassment was pervasive in that it occurred over an extended period and involved multiple forms of race-based mistreatment, including direct exposure to racist statements, disparate treatment, exclusion, and ongoing differential treatment compared to Caucasian employees.

241. Defendants, through their agents, supervisors, and management officials, had actual knowledge of the hostile work environment to which Plaintiff was subjected.

242. Specifically, Defendants' supervisors and representatives were present on the video conference call when the racist statements were made and heard them directly. Additionally, following the call, the client's manager acknowledged to Plaintiff that the statements were inappropriate, demonstrating Defendants' actual knowledge of the racist conduct.

243. Despite having actual knowledge of the hostile work environment, Defendants failed to take prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.

244. Defendants failed to:

    a.    Investigate the racist statements made during the video conference call;

    b.    Take any disciplinary or corrective action in response to the incident;

    c.    Communicate to the client or its board members that such racist statements were unacceptable;

    d.    Implement any measures to protect Plaintiff from future racist conduct;

    e.    Provide Plaintiff with any assurance that she would not be subjected to similar harassment in the future; or

      f.     Address the ongoing disparate treatment and exclusionary conduct Plaintiff experienced based on her race.

245.    Defendants' complete failure to respond to the racist statements made in Plaintiff's presence during a work meeting, despite acknowledging they were inappropriate, constituted ratification and condonation of the racist conduct.

246.    Defendants are liable for the hostile work environment under Title VII because it knew or should have known of the harassment and failed to take prompt and appropriate corrective action.

247.    With respect to harassment by third parties (the client's board members), Defendants had actual knowledge of the harassment and failed to take any remedial action reasonably likely to prevent recurrence of the harassment.

248.    With respect to harassment by Defendants' supervisors and employees, Defendants are strictly liable because the harassment was carried out by individuals with supervisory authority over Plaintiff and/or because Defendants ratified and condoned the harassment through their failure to respond.

249.    Defendants' supervisors, managers, directors, human resources personnel, officers, and agents engaged in or failed to remedy the discriminatory conduct as part of their ordinary employment duties and within the scope of their employment.

250.    The hostile work environment was so objectively intolerable that it forced Plaintiff to take medical leave. The harassment directly caused or substantially contributed to Plaintiff's need for medical treatment and her inability to continue working in the hostile environment Defendants created and failed to remedy.

251. After Plaintiff exhausted her available leave, Defendants terminated her employment for failing to return to work. Plaintiff's inability to return was caused by the hostile work environment Defendants created and failed to remedy.

252. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer:

      a.     Lost wages, salary, bonuses, benefits, and other compensation from the date of her forced leave through the present and continuing into the future;

      b.     Severe emotional distress, humiliation, embarrassment, mental anguish, anxiety, depression, and other psychological harm;

      c.     Loss of enjoyment of life and damage to her professional reputation and career prospects;

      d.     Medical expenses for treatment necessitated by the hostile work environment; and

      e.     Other economic and non-economic damages in amounts to be proven at trial.

253. Plaintiff has been compelled to retain counsel to enforce her rights under Title VII and § 1981 and is entitled to recover reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988.

254. Defendants' conduct was willful, malicious, and carried out with reckless indifference to Plaintiff's federally protected rights. Defendants had actual knowledge that racist statements were made in Plaintiff's presence during a work meeting, acknowledged that the statements were inappropriate, yet consciously chose to take no action whatsoever to investigate,

remedy, or prevent recurrence of the harassment. This deliberate indifference to Plaintiff's civil rights warrants an award of punitive damages.

255.    Plaintiff is informed and believes, and based thereon alleges, that the Defendants' conduct as described above was willful, wanton, malicious and done in reckless disregard for the safety and well-being of Plaintiff. By reason thereof, Plaintiff is entitled to punitive and exemplary damages from Defendants in the sum according to proof at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Danielle Miller, demands judgment against Defendants, jointly and severally, in an amount which will compensate her for:

a.  Declare that Defendants violated Plaintiff's rights under Title VII, §1981, and the IHRA;

b.  Award back pay, front pay, and lost benefits;

c.  Award compensatory and punitive damages;

d.  Award attorney's fees and costs pursuant to 42 U.S.C § 2000e-5(k) and 42 U.S.C. 1988;

e.  Award Pre-judgment and post-judgment interest;

f.  Award of any medical costs and expenses incurred, past and future, as a result of Defendants' unlawful conduct;

g.  Order Equal Employment Opportunity training for Defendants and the supervisory officials at issue herein;

h.  Award equitable, declaratory, and injunctive relief;

i.  Trial by jury on all triable issues; and

j.  Award such other and further relief as this Honorable Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

November 14, 2025                              Respectfully submitted,

                                              /s/ **Abigail Schmitz**

### VERIFICATION OF DANIELLE MILLER

I hereby affirm that the foregoing First Amended Complaint was reviewed by me and is true and correct to the best of my knowledge and belief.  I am aware that if any of the foregoing answers are willfully false, I am subject to punishment.

DATED: November 14, 2025

Danielle K Miller
ID D1nkz7XdX6EeyPXwjCbaum3U

Danielle Miller
11/14/2025

# eSignature Details

| | |
|---|---|
| **Signer ID:** | **D1nkz7XdX6EeyPXwjCbaum3U** |
| Signed by: | Danielle Miller |
| Sent to email: | thepivotnurse@gmail.com |
| IP Address: | 77.136.238.180 |
| Signed at: | Nov 14 2025, 3:22 pm CST |

# <u>EXHIBIT A</u>



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Nashville Area Office
220 Athens Way, Suite 350
Nashville, TN 37228
(629) 236-2240
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/02/2025

**To:** Dr. Danielle K. Miller
6301 N Sheridan Road 10G
CHICAGO, IL 60660

Charge No: 440-2024-02094

EEOC Representative and email:    VERONICA TAKACS
Investigator
Veronica.Takacs@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 440-2024-02094.

On behalf of the Commission,

Digitally Signed By:Phillip Bornefeld
04/02/2025
Phillip Bornefeld
Area Office Director

## CERTIFICATE OF SERVICE

I certify that on November 14, 2025, the foregoing document was electronically filed with the Clerk of the Court for the U.S. District Court for the Northern District of Illinois using the CM/ECF system, which will send electronic notification of such filing to all registered participants in the case, and a courtesy copy sent to Defendants' counsel of record via electronic mail as follows:

Littler
Kaytee Okon
KOkon@littler.com


/s/ *Jana Thorson*
Paralegal, Abigail Schmitz Law, LLC